**Opinion filed September 30, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00247-CR
_____

## MANUEL JAVIER PEREZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CR37715**

## M E M O R A N D U M   O P I N I O N

The jury convicted Manuel Javier Perez of two counts of aggravated sexual assault of a child (Counts I and II) and one count of indecency with a child (Count III). The jury assessed punishment at confinement for a term of twenty-five years for each aggravated sexual assault offense and confinement for a term of five years for the indecency with a child offense. The trial court sentenced

Appellant accordingly, ordered that the sentences on Counts I and II run concurrently, and ordered that the sentence on Count III run consecutively to the sentences on Counts I and II. The trial court entered separate judgments on each of the counts. We affirm.

*The Charged Offenses*

The indictment referred to the child by her real name. We will refer to her by "M.M." to protect her identity. M.M. is Appellant's daughter. Count I of the indictment alleged that, on or about August 13, 2010, Appellant sexually assaulted M.M., a child younger than fourteen years of age, by penetrating her sexual organ with his sexual organ. Count II alleged that, on or about August 14, 2010, Appellant sexually assaulted M.M., a child younger than fourteen years of age, by penetrating her sexual organ with his sexual organ. Count III alleged that, on or about August 13, 2010, Appellant engaged in sexual contact with M.M. by touching her breast. Counts IV, V, and VI alleged that, on or about and between June 1, 2009, and August 1, 2010, Appellant sexually assaulted M.M. by penetrating her sexual organ with his sexual organ, engaged in sexual contact with M.M. by touching her genitals, and engaged in sexual contact with M.M. by touching her breast. The jury convicted Appellant of the first, second, and third counts, and it acquitted Appellant of the fourth, fifth, and sixth counts.

*Issues on Appeal*

Appellant does not challenge the sufficiency of the evidence to support his convictions. He presents three points of error for review. In his first point, Appellant contends that the trial court erred by excluding evidence that was vital to his presentation of a meaningful defense. Appellant asserts that the trial court's evidentiary errors effectively precluded him from presenting a defense. In his second point, Appellant contends that the trial court erred by denying his motion for continuance. In the motion, Appellant asserted that he needed more time to

2

obtain the appearance of a witness at trial. In his third point, Appellant contends that the trial court erred by refusing to grant his motion for new trial.

*The Evidence at Trial*

Although Appellant does not challenge the sufficiency of the evidence, we will summarize the evidence to provide context for the points of error on appeal. In August 2010, M.M. lived in an apartment with her mother, her stepfather, and her sister and brother. At that time, M.M. was thirteen years old. During the evening of August 13, 2010, Appellant exercised his visitation rights to M.M. Appellant picked her up at her apartment. M.M testified that Appellant drove around in Appellant's pickup and looked for his friend but could not find him. Appellant then took M.M. to his mother's house. M.M. said that Appellant drank more than three beers while there. M.M. and Appellant left his mother's house. Appellant again looked for his friend but did not find him. Appellant then drove to another friend's body shop. M.M. said that no one was at the shop. She said that Appellant opened the shop with a key and drove his pickup into the shop. M.M. and Appellant were inside the shop for about two hours. While there, Appellant drank more beer. M.M. testified that, while she and Appellant were inside the body shop, Appellant kissed her on the lips, gave her a hickey on her neck, and touched her breasts over her clothes. Appellant told M.M. that the hickey looked good on her.

Appellant and M.M. left the body shop. M.M. testified that Appellant went to the Scottish Delight Motel to rent a room. She said that he rented Room 116, which was a downstairs room. The State introduced a registration card from the Scottish Delight Motel into evidence. The card was signed by Appellant and showed that he rented Room 116 on August 13, 2010. M.M. and Appellant went into the room. M.M. testified that she took a shower. She put back on her capri pants, bra, and shirt. M.M. said that she lay down on the one bed that was in the

room. She testified that Appellant took a shower and then climbed into bed with her. M.M. said that Appellant took off his shorts. M.M. saw that Appellant's penis was "hard and long." M.M. said that she took off her capri pants because "[she] already knew what was coming" and "[she] was ready to get it over with." She said that Appellant had previously had sexual intercourse with her.

M.M. testified that, after she took off her capri pants, Appellant "rolled on top of [her]" and "had sexual intercourse with [her]." She said that Appellant put his penis into her vagina and moved it in and out of her vagina. M.M. said that Appellant touched her breasts under her bra. M.M. testified that, after Appellant finished having sexual intercourse with her, Appellant tried to put his penis in her anus but was unsuccessful. Appellant lay down on the bed and went to sleep. M.M. said that she also fell asleep.

M.M. said that Appellant woke up at 5:00 or 6:00 a.m. the next morning. After he woke up, Appellant had sexual intercourse with M.M. again. M.M. said that Appellant put his penis in her vagina and moved it in and out of her vagina. When asked whether Appellant ejaculated on either of the above two occasions of sexual intercourse, M.M. said, "Not inside." She said that she did not see him ejaculate on either occasion.

M.M. testified that she lived with Appellant and his fiancée, Amy Perez, for about two weeks during the summer of 2009. Appellant was married to Amy at the time of trial. M.M. said that, while she lived with Appellant, he touched her breasts and vagina under her clothes. M.M. also said that Appellant had sexual intercourse with her two times when she lived with him. She testified that Appellant put his penis inside her vagina on both of these occasions.

After Appellant finished having sex with M.M. the morning of August 14, 2010, Appellant drove M.M. to her mother's apartment and dropped her off there. Later that day, M.M. went to the grocery store with her mother, Melissa. M.M.

4

testified that, at the grocery store, Melissa asked her about the hickey that was on her neck. M.M. told Melissa that she would explain the hickey to her when they got home. Melissa testified that, when they arrived home, M.M. told her that Appellant gave her the hickey and that Appellant raped her two times at the Scottish Delight Motel. Melissa called the police. M.M. met with the police, and the police took her to Midland Memorial Hospital, where a nurse performed a sexual assault examination on her.

Paula Brookings, a sexual assault nurse examiner, testified that she performed an examination of M.M. on August 14, 2010. At that time, M.M. told Brookings that "[Appellant] put his penis inside [her]" and that "[h]e woke up again later and put it in [her] again." Brookings saw a purplish bruise on the left side of M.M.'s neck. M.M. told Brookings that "[Appellant] kissed [her] and gave [her] a hickey." M.M. complained of vaginal soreness. When Brookings examined M.M.'s vaginal area, she observed multiple abrasions to an area called the "fossa navicularis." Brookings described such abrasions as an injury that commonly results from sexual intercourse or sexual assault. Brookings said that M.M.'s abrasions were "fairly recent" and were consistent with the history M.M. gave that Appellant sexually assaulted her. Based on her findings, Brookings arrived at the opinion that M.M. had been sexually assaulted. Brookings also observed dried body secretions on M.M.'s neck and on her thigh between her legs. Brookings swabbed each side of M.M.'s neck, vagina, anal cavity, mouth, and teeth so that DNA testing could be performed on the substances swabbed.

Angela Rodriguez Garcia, a forensic scientist at the Texas Department of Public Safety Crime Lab in Lubbock, performed a forensic DNA analysis of the samples that were taken from M.M.'s body and compared those samples to a sample buccal swab that was taken of Appellant's saliva. Garcia's testing of the samples showed the presence of spermatozoa on the anal and thigh swabs. Further

testing of those swabs revealed that the sperm cell fraction on the swabs was consistent with Appellant's DNA profile and that the probability a male other than Appellant could be the source of the profile was about 1 in 22.1 quintillion for Caucasians, 1 in 37.23 quintillion for blacks, and 1 in 48.45 quintillion for Hispanics. Garcia testified that, to a reasonable degree of scientific certainty, Appellant was the source of the DNA profile on the anal and thigh swabs. Testing of the left neck swab revealed a DNA profile that was consistent with a mixture of Appellant's DNA and M.M.'s DNA.

Midland Police Detective Kay Therwhanger was the investigating officer in the case. Detective Therwhanger conducted a recorded interview of Appellant on August 31, 2010. A copy of the interview was admitted into evidence and played for the jury. During the interview, Appellant stated that he had never sexually assaulted M.M. Appellant also stated a number of times that he did not know why M.M. was saying that he had had sex with her.

Appellant presented a number of witnesses at trial. Ubaldo Gonzalez testified that he was Appellant's friend. In August 2010, Gonzalez was the lessee of the body shop that M.M. testified about. Gonzalez said that Appellant never had a key to the shop.

Rachel Torres testified that she and Appellant had had a sexual relationship for three years. Torres said that she met Appellant in Room 208, which was an upstairs room, at the Scottish Delight Motel at about 9:30 p.m. on August 13, 2010. Torres said that she and Appellant had sex on that occasion. Torres said that Appellant used a condom during their sexual intercourse and that Appellant ejaculated. Appellant got up and went into the bathroom. Torres later went into the bathroom. She testified that the condom was in the trash can in the bathroom. She said it was "[w]here everybody could see it." Torres said that she left the motel at about 11:00 p.m.

6

Amy, who was Appellant's wife, testified that M.M. was not welcome in her home in August 2010. Amy said that M.M. lived with her and Appellant for about three weeks in May or June 2009. Amy said that M.M. tried to turn her and Appellant against each other. Amy said that, in August 2010, she did not think that visitation was taking place between Appellant and M.M.

Appellant presented testimony from a number of his sexual partners about his sexual habits. The witnesses said that Appellant had never given them hickeys and that Appellant had never expressed an interest in anal sex. The witnesses also said that they had never had sex with Appellant in the morning following a night in which they had sex with him.

Appellant testified that he never sexually assaulted M.M. and that he never touched her breasts. Appellant said that he snorted cocaine and drank a lot of beer on August 13, 2010. He said that, at about 9:00 p.m. that day, he rented an upstairs room at the Scottish Delight Motel. Appellant said that he and Torres had sex in the room. Appellant said that he used a condom. He said that his phone rang while they were having sex. Appellant said that, after he and Torres had sex, he went into the bathroom to clean himself. He testified that he put the condom in the trash can.

Appellant said that he checked his phone and saw that M.M. had called him three times. He called M.M. back at about 10:30 p.m. Appellant testified that he told Torres he was going to pick up M.M. He said that Torres left the motel. Appellant said that he left the motel and that, at about 11:00 p.m., he picked up M.M. at Melissa's apartment. Appellant said that M.M. was not welcome at the house he shared with Amy. He testified that he did not notice a hickey on M.M.'s neck, that he did not give her a hickey, and that he had never given a girl a hickey.

Appellant said that he took M.M. to the same room that he had been in with Torres at the Scottish Delight Motel. He said that he had not cleaned up the room

and that there were empty beer bottles in the room. Appellant testified that M.M. got mad at him when she saw the beer bottles and realized that he had already been in the room.

Appellant testified that M.M. took a shower. Appellant said that he was tired and that he got into bed. After M.M. showered, she got into bed. Appellant said that he fell asleep. Appellant testified that he woke up at about 7:00 a.m. the next morning and that, at that time, M.M. was asleep. Appellant said that, after M.M. woke up, he told her that he was going to take her home. He said that he dropped her off at her home at about 8:00 a.m.

Appellant acknowledged that, when Detective Therwhanger interviewed him, he did not tell her that he had sex with Torres on August 13, 2010, at the Scottish Delight Motel. Nor did he tell Detective Therwhanger that he threw a condom into the trash can after having sex.

*Evidence Excluded by Trial Court*

Appellant's defensive theory was that M.M. falsely accused him of sexual assault because she was angry at him. Appellant attempted to introduce the following evidence to support his defense: (1) that M.M. made a previous outcry of sexual abuse against her stepfather, Daniel; (2) that, on August 12, 2010, M.M. told Appellant that Daniel sexually abused her; (3) that, in response, Appellant told M.M. that he was going to tell the police that Daniel sexually abused her; and (4) that Appellant also told M.M. that she could not live with Appellant. Appellant asserted that his threat to tell the police about Daniel and his statement to M.M. that she could not live with him angered M.M. and caused her to make up false sexual assault allegations against him. Upon the State's objections, the trial court ruled that the evidence was not relevant and, therefore, refused to admit it.

Appellant presented the excluded evidence to the trial court in the form of offers of proof outside the jury's presence. Specifically, Appellant offered

evidence that M.M. sent a MySpace message to her cousin, Vanessa Flores, on February 25, 2010, in which she stated that Daniel "tried touching [her]," that she told her mother, and that her mother did not believe her. Outside the jury's presence, M.M. testified that she wrote the February 25, 2010 MySpace message and that the allegations in the message were true. During M.M.'s testimony before the jury, M.M. had said that her relationship with Daniel was good and that Daniel was nice to her.

Outside the jury's presence, Appellant testified that, during an August 12, 2010 telephone call, M.M. told him that Daniel sexually abused her and her sister. Appellant said that, in response, he told M.M. that he was going to report Daniel to the police. Appellant also told M.M. that she could not live with him. He said that his response made M.M. mad and that "she called [Appellant] a bitch, or something of that nature." Appellant said that he believed M.M. made up the sexual abuse allegations against him because she was mad at him.

Also outside the jury's presence, M.M. testified that she did not tell Appellant that Daniel tried to molest her. She also said that Appellant did not tell her that he was going to call the police or that she could not live with him because of her relationship with Appellant's wife.

*Right to Present a Defense*

In his first point of error, Appellant contends that the trial court erred by excluding the above evidence and that the trial court's evidentiary errors precluded him from presenting a vital defensive theory. Appellant asserts that, in the absence of the excluded evidence, he was unable to explain why M.M. would have made up the allegations against him.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006); *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). An

9

appellate court will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Burden*, 55 S.W.3d at 615.

The United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "Erroneous evidentiary rulings rarely rise to the level of denying fundamental constitutional rights to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). However, the improper exclusion of evidence may establish a constitutional violation when the trial court erroneously excludes relevant evidence that is a vital portion of the case and effectively precludes the defendant from presenting a defense. *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005); *Potier*, 68 S.W.3d at 659–62.

Appellant contends that the excluded evidence was admissible to show M.M.'s motive to falsely accuse him of sexual assault. A criminal defendant has a constitutional right to confront the witnesses against him. U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10; *Johnson v. State*, 208 S.W.3d 478, 504 (Tex. App.—Austin 2006, pet. ref'd). The possible animus, motive, or ill will of a witness who testifies against a defendant is never a collateral or irrelevant inquiry. *Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009). The defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him. *Id.* at 43. Thus, as part of the confrontation right, a trial court must give a defendant great latitude to show any fact that might tend to affect a witness's credibility, including ill feeling, bias, or motive. *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009); *Johnson*, 208 S.W.3d at 504.

Appellant claimed that M.M. made up false sexual assault allegations against him. The trial court excluded all evidence that related to the possibility that M.M. fabricated the allegations because she was angry at Appellant for threatening to tell the police that Daniel sexually abused her and for telling her that she could not live with him. This evidence was relevant to show M.M.'s potential motive to testify against Appellant. Therefore, the trial court abused its discretion by excluding it. Had the jury heard the excluded evidence and believed it, the jury could have concluded that a possible motive arose for M.M. to make up sexual assault allegations against Appellant. Without the excluded evidence, Appellant could not offer the jury a reasonable explanation as to why M.M. would have made up the allegations. Based on this fact, we conclude that the excluded evidence was vital to Appellant's defense and that the trial court's erroneous evidentiary ruling denied Appellant his right to present a meaningful defense.

At trial, the State argued that M.M.'s MySpace message that Daniel tried to touch her and M.M's alleged statement to Appellant that Daniel sexually abused her were inadmissible under *Lopez v. State*, 18 S.W.3d 220 (Tex. Crim. App. 2000). The State cites *Lopez* in its appellate brief. In *Lopez*, the defendant was charged with sexual assault of a child. 18 S.W.3d at 221. The defendant sought to impeach the child's credibility with evidence that the child had previously falsely accused his mother of physical abuse. *Id.* The *Lopez* court concluded that evidence related to the child's prior accusation against his mother did not have any probative value in impeaching the child's credibility because the defendant had not shown the prior accusation was false and because the defendant had not shown the prior accusation and the accusation against him were similar. *Id.* at 225–26. The court concluded that the Confrontation Clause did not require the admission of the evidence. *Id.* at 226.

11

The State relies on *Lopez* in arguing that, because Appellant did not show that M.M. made a false accusation against Daniel that was similar to M.M.'s accusation against Appellant, evidence of M.M.'s MySpace message and of M.M.'s alleged statement to Appellant that Daniel sexually abused her was inadmissible. However, *Lopez* is distinguishable from this case. Appellant's defense did not depend on whether M.M.'s allegations against Daniel were false. Instead, Appellant sought to introduce the evidence to show that his response to M.M.'s alleged statement to him that Daniel sexually abused her angered her. Appellant offered this evidence to explain why M.M. got mad at Appellant and had a motive to make up the allegations against him. The evidence related to M.M.'s motive to testify against him. As such, we conclude that the evidence was not inadmissible under *Lopez*.

Because the erroneous exclusion of Appellant's evidence constituted constitutional error, we will conduct a harmless error analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 44.2(a); *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007); *Potier*, 68 S.W.3d at 665. Under Rule 44.2(a), we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to Appellant's conviction or punishment. In this case, the question is whether the trial court's failure to allow Appellant to introduce the excluded evidence to show M.M.'s possible motive to make up the allegations against him and to testify against him was harmless beyond a reasonable doubt.

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). The presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002);

*Wesbrook*, 29 S.W.3d at 119. An analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination of whether, beyond a reasonable doubt, the error did not contribute to the conviction or punishment. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011).

The correct inquiry for whether the exclusion of evidence in violation of the Confrontation Clause is harmless "is whether, assuming that the damaging potential of the [excluded evidence] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Snowden*, 353 S.W.3d at 822 n.31 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). After indulging this preliminary assumption, an appellate court should examine numerous factors in its harmless error analysis, including the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.*

We have examined the record, and we have summarized the evidence above. M.M.'s testimony was important to the prosecution's case. Sexual assault and indecency with a child cases are frequently "he said, she said" trials in which the jury must reach a unanimous verdict based upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence. *Hammer*, 296 S.W.3d at 561–62. In those cases, the credibility of the complaining witness is extremely important. A witness's credibility is less important where other evidence or testimony corroborates the witness's testimony. *Woodall v. State*, 77 S.W.3d 388, 396 (Tex. App.—Fort Worth 2002, pet. ref'd). This case is not merely a "he said, she said" trial. The physical evidence and DNA evidence corroborated M.M.'s testimony. M.M. testified that Appellant sexually

13

assaulted her the night of August 13, 2010. M.M. also testified that Appellant sexually assaulted her again the morning of August 14, 2010. That same day, Brookings examined M.M. Brookings observed recent abrasions in M.M.'s vaginal area. Garcia's DNA analysis showed the presence of Appellant's sperm on the anal and thigh swabs that Brookings gathered from M.M.

The State presented evidence that Appellant rented Room 116 at the Scottish Delight Motel on August 13, 2010. Appellant signed a registration form for that room, and M.M. testified that she and Appellant stayed in that room, which was a downstairs room. Torres testified that she and Appellant were in Room 208, an upstairs room, the night of August 13, 2010. Appellant testified that he took M.M. to the same room that he had been in with Torres and that the room was an upstairs room. Torres and Appellant both testified that Appellant put the used condom in the trash can after they had sex. Appellant wanted the jury to infer that M.M. took the condom out of the trash can in Room 208 and put his sperm on her thigh and anus. However, an employee of the motel testified that, on August 13, 2010, Room 208 was rented to a man named Roman Urquidi. The State introduced a registration card from the motel that showed Urquidi rented Room 208 from July 30, 2010, through September 17, 2010. A copy of Urquidi's identification card was stapled to the registration form. Thus, the State presented strong evidence that M.M. and Appellant were not in Room 208 on August 13, 2010. This evidence corroborated M.M.'s testimony that she and Appellant were in Room 116.

Outside the jury's presence, Appellant testified that, on August 12, 2010, M.M. told him that Daniel sexually abused her and her sister. According to Appellant, he told M.M. that he was going to report Daniel to the police. However, Appellant did not report Daniel to the police. Instead of calling the police, Appellant spent the night of August 13, 2010, with M.M. and, the next

14

morning, dropped her off at the very apartment where Daniel lived. On August 31, 2010, Appellant gave his recorded interview to Detective Therwhanger. Appellant said many times during his interview that he did not know why M.M. would have made up the allegations against him. Appellant did not tell Detective Therwhanger that M.M. made an outcry about Daniel to him. Nor did Appellant tell Detective Therwhanger that he believed his response to M.M. angered her and caused her to falsely accuse him of sexual assault.

We recognize that the jury is the sole judge of the witnesses' testimony and the weight to be given their testimony. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). However, based on our review of the record, and in light of the strong scientific and physical evidence that corroborated M.M.'s testimony that Appellant sexually assaulted her, we cannot conclude that the jury would have been influenced by the excluded testimony. After carefully reviewing the record, we conclude beyond a reasonable doubt that the trial court's error did not contribute to Appellant's conviction or punishment. Therefore, the error was harmless.

Appellant also contends that the trial court's exclusion of evidence violated various state evidentiary rules. Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *James v. State*, 335 S.W.3d 719, 726 (Tex. App.—Fort Worth 2011, no pet.); *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Under Rule 44.2(b), we are to disregard any error unless it affected the defendant's substantial rights. We have concluded that the trial court's error in excluding Appellant's evidence was harmless under the more stringent standard imposed by Rule 44.2(a) for analyzing harm of constitutional errors. Therefore, we need not conduct a separate harm analysis under the less stringent standard

15

imposed by Rule 44.2(b) for analyzing harm of nonconstitutional errors. *Render v. State*, 347 S.W.3d 905, 920 (Tex. App.—Eastland 2011, pet. ref'd). Appellant's first point of error is overruled.

*Appellant's Motion for Continuance*

On the third day of trial, Appellant filed a motion for continuance so that he could serve a subpoena on Daniel to compel his attendance as a witness. The trial court denied the motion. In his second point of error, Appellant contends that the trial court erred when it denied his motion for continuance.

A trial court may grant a continuance even after trial has begun "when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." TEX. CODE CRIM. PROC. ANN. art. 29.13 (West 2006). We review a trial court's ruling on a motion for continuance under an abuse of discretion standard. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App, 2007); *Janecka v. State*, 937 S.W.2d 456, 458 (Tex. Crim. App. 1996). To establish an abuse of discretion, an appellant must show that the trial court erred by denying his motion for continuance and that he was harmed by the denial of a continuance. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010); *Janecka*, 937 S.W.2d at 468.

The trial of this case began on May 23, 2011. Appellant filed his motion for continuance on May 25, 2011. In the motion, Appellant stated that process servers had made multiple attempts to serve a subpoena on Daniel but, despite their diligent efforts, had been unable to serve him. The trial court held a hearing on the motion. At the hearing, Appellant's counsel stated that "[he] figured the best thing to try to do was to try to get [Daniel] subpoenaed in plenty of time before trial" and that "[w]e had made that effort to do so." The trial court noted that the application

for a subpoena for Daniel was file-marked on May 16, 2011. Following the hearing, the trial court denied Appellant's motion for continuance.

Appellant filed affidavits from two process servers, Johnie Eads and Teresa Cornelius, in support of his motion for new trial. Eads and Cornelius both stated in their affidavits that the subpoena for Daniel was issued on May 16, 2011. Eads stated in his affidavit that he attempted to serve the subpoena on Daniel at Daniel's residence on May 16, 2011, and that either he or Cornelius attempted to serve Daniel at Daniel's residence on May 17, May 18, May 19, May 20, and May 22. Eads also stated that he also attempted to serve Daniel at Daniel's residence on May 23 or May 24. Cornelius stated in her affidavit that she attempted to serve a subpoena on Daniel at his residence on May 18, May 19, May 22, and May 23.

The record shows that Appellant was aware of problems securing Daniel's appearance at trial the week before trial. Because Appellant was aware of the problems before trial, he cannot demonstrate that Daniel's absence was an "unexpected occurrence since the trial began, which no reasonable diligence could have anticipated" or that Appellant was "so taken by surprise" that he could not have had a fair trial. CRIM. PROC. art. 29.13. We conclude that the trial court did not abuse its discretion when it denied Appellant's motion for continuance.

Additionally, a trial court may properly deny a motion for continuance if the evidence does not indicate a probability that the witness can be secured by a postponement or if it appears that a continuance due to the absence of the witness would delay the trial indefinitely. *Varela v. State*, 561 S.W.2d 186, 191 (Tex. Crim. App. 1978); *Rodriguez v. State*, 21 S.W.3d 562, 565–66 (Tex. App.— Houston [14th Dist.] 2000, pet. ref'd). Appellant did not present evidence that he could secure Daniel's presence at trial if the trial court granted a continuance. Nothing in the record indicates that there was a probability that Daniel could be secured as a witness by a postponement or that the trial would not have been

delayed indefinitely had the trial court granted a continuance. For this additional reason, we conclude that the trial court did not abuse its discretion when it denied Appellant's motion for continuance. Appellant's second point of error is overruled.

*Appellant's Motion for New Trial*

Appellant filed a motion for new trial based on grounds of (1) newly discovered evidence and (2) a material defense witness, Daniel, being kept away from the trial by fraud. The record does not show that Appellant presented the motion to the trial court. The motion was overruled by operation of law. In his third point of error, Appellant contends that the trial court erred by its failure to grant his motion for new trial.

We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). On appeal, Appellant contends that he was entitled to a new trial based on newly discovered evidence. A new trial shall be granted when material evidence favorable to the accused has been discovered since trial. TEX. CODE CRIM. PROC. ANN. art. 40.001 (West 2006). To meet the statutory requirement of materiality set forth in Article 40.001, a defendant must show (1) the evidence was unknown or unavailable to him at the time of trial; (2) his failure to discover or to obtain the evidence was not due to lack of diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Keeter*, 74 S.W.3d at 36–37. If an appellant fails to establish any one of these prongs, he fails to establish an abuse of discretion by the trial court in denying the motion for new trial. *Jones v. State*, 234 S.W.3d 151, 157 (Tex. App.—San Antonio 2007, no pet.).

The trial court determines the credibility of the witnesses and whether the new evidence is probably true. *Keeter*, 74 S.W.3d at 37. The "probably true" requirement may be satisfied when the whole record presents no good cause to doubt the credibility of the witness whose testimony constitutes the new evidence. *Id.* at 38 (quoting *Jones v. State*, 711 S.W.2d 35, 36 (Tex. Crim. App. 1986)).

Appellant filed an affidavit of Samantha Jurado in support of his newly discovered evidence claim. In the affidavit, Jurado, who was twenty-six years old, stated, "[Appellant] was married to my mother and was my step-father." Jurado did not identify her mother by name in the affidavit. Jurado stated that she had a younger sister, Priscilla, who was eleven years old in August 2010. Jurado also stated that Appellant is Priscilla's father.

According to Jurado, M.M. called Priscilla shortly after Appellant was arrested in this case. Jurado stated in the affidavit that Priscilla asked her whether she should speak with M.M. Jurado stated that she told Priscilla, "Yes." Jurado then turned on the speaker on Priscilla's cell phone so that she could hear what M.M. said. Jurado stated that, during the call, M.M. told Priscilla that, on August 14, M.M.'s mother, Melissa, saw the hickey on her neck and got mad at her. According to Jurado, M.M. also told Priscilla that M.M.'s boyfriend gave her the hickey and that M.M. made up a story that Appellant gave her the hickey because she wanted to continue to see her boyfriend. M.M. also told Priscilla that she was sorry she blamed Appellant for giving her the hickey.

Jurado stated in her affidavit that she told her mother about what M.M. told Priscilla in the above conversation and that, in response, her mother told her that she did not want Priscilla to be involved in the case because of her age. Jurado understood her mother's statement to mean that she should not tell anyone about what M.M. told Priscilla. Jurado also stated that, at the time of giving her affidavit, she knew "the issue involving the hickey was a big issue in the trial" and

that, therefore, she realized "[she] should have said something to [Appellant's] attorney."

On this record, the trial court could have reasonably concluded that Appellant's new evidence was merely impeachment evidence that would be used in an attempt to discredit M.M.'s testimony that Appellant gave her the hickey. Additionally, as the judge of Jurado's credibility and of the statements in Jurado's affidavit, and based on the evidence at trial, including the DNA evidence, the trial court could have reasonably concluded that Appellant failed to show that Jurado's affidavit testimony was probably true or that her testimony would bring about a different result in a new trial. Therefore, the trial court did not abuse its discretion when it allowed Appellant's motion for new trial based on the ground of newly discovered evidence to be overruled by operation of law.

Appellant also contends that he was entitled to a new trial on the ground that a material defense witness, Daniel, was kept away from court by fraud committed by Melissa. A defendant must be granted a new trial "when a material witness has been kept away by force, threats or fraud." TEX. R. APP. P. 21.3(e). The underlying rationale for the fraud provision in this rule is "to provide relief in those rare instances in which a material defense witness is deceived or tricked into not appearing in court." *Rodriguez*, 21 S.W.3d at 567.

As stated above, Appellant filed affidavits of Eads and Cornelius in support of his motion for new trial. In the affidavits, Eads and Cornelius detailed their numerous but unsuccessful efforts to serve a subpoena on Daniel at his residence. Eads stated in his affidavit that he talked with Melissa at the residence on May 16. Eads told Melissa that he was there to serve a subpoena on Daniel in the criminal case involving Appellant. According to Eads, Melissa "smirked" at him and told him that she would tell Daniel that Eads had come by when Daniel got off work, which would be sometime after 7:30 p.m. Eads gave Melissa his cell phone

20

number, and Melissa told him that she would have Daniel call him when he got home from work. Melissa told Eads that Daniel spoke Spanish. Eads gave Melissa the telephone number of Cornelius, who spoke Spanish. Eads stated that neither he nor Cornelius received a return call from Melissa or Daniel.

Eads stated that he went back to the residence on May 21. At that time, he spoke to Melissa. Melissa told him that she did not know where Daniel was, where he worked, or when he would return. Eads stated that he went back to the residence on May 23 or May 24. At that time, he talked with an older man. The man told Eads that Daniel did not live at the residence. Cornelius stated in her affidavit that she went to Daniel's residence on May 23. At that time, Cornelius spoke to Melissa. Cornelius stated that Melissa denied that she knew where Daniel was, where he worked, or when he would return. Cornelius also stated that Melissa demanded that she immediately leave the property. Eads and Cornelius believed that Melissa deceived them, concealed Daniel's whereabouts from them, and obstructed their efforts to serve Daniel with a subpoena.

The affidavits of Eads and Cornelius might be sufficient to establish that Melissa did not cooperate with them in their efforts to serve Daniel. However, the affidavits do not contain any evidence that Melissa engaged in any conduct, much less fraudulent conduct, to deceive or to trick Daniel into not appearing at Appellant's trial. Daniel may not have wanted to appear at the trial. Appellant has not met his burden under Rule 21.3(e) to show that acts or omissions on the part of Melissa constituted fraud that prevented Daniel from appearing in court. *Rodriguez*, 21 S.W.3d at 567. The trial court did not abuse its discretion by failing to grant Appellant's motion for new trial that was based on Rule 21.3(e). Appellant's third point of error is overruled.

*This Court's Ruling*

We affirm the judgments of the trial court.

TERRY McCALL

JUSTICE

September 30, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.